United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT VALLADON, et al., | No. C 06-07478 SI |
| Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SUBGROUP Q** |
| v. | |
| CITY OF OAKLAND, | |
| Defendant. | |

On July 17, 2009, the Court heard oral argument on defendant's motion for partial summary judgment on subgroup Q. Having considered the arguments of the parties and the papers submitted, and for good cause shown, defendant's motion is GRANTED.

**BACKGROUND**

Plaintiffs consist of approximately 560 police officers who are or were employed by the City of Oakland ("Oakland"). Plaintiffs assert 21 subgroups of claims (subgroups A-Q) under the Fair Labor Standards Act ("FLSA"). Pursuant to a stipulation by the parties, the Court entered an order on March 10, 2008 conditionally certifying this matter as a collective action and specifying that the deposition testimony of randomly selected representatives from each subgroup would be binding on every officer in that subgroup. *See* Docket No. 74. Now before the Court is Oakland's motion for partial summary judgment on subgroup Q, which concerns compensatory time off.

The parties refer to the Oakland Police Department's practice for administering requests to take accrued compensatory time off ("CTO") as a "Red Book" system, for the color of the book in which CTO requests are recorded. Under the Red Book system, a certain number of slots are available on a

given day for officers to take CTO. *See* Decl. of Breanne Sheetz in Supp. of Pls. Opp. to Def. Summ. J. Mot. Subsection Q ("Sheetz Subsection Q Decl."), ex. A (Deputy Chief Jeffrey Israel Depo.), Tr. 115: 1-11. [Docket No. 154] The number of CTO slots that are available on a particular day is determined by the number of individuals who are already scheduled for different forms of leave, such as vacation, military leave, or long-term disability. *Id.* at 117:7-16.

Officers requesting CTO more than thirty days in advance had to make their requests by letter. Decl. of Geoffrey Spellberg in Supp. of Defs. Mot. Subsection Q ("Spellberg Subsection Q Decl."), ex. A (Officer Charles Ilacqua Depo.), Tr. 14-20. Officers were allowed to make requests for CTO by letter twice a year. Sheetz Subgroup Q Decl., ex. N. (Officer Nicole Elder Depo.), Tr. 13:16-23. This was the "safe" way to request CTO because "generally speaking" a day was more likely to be free if the officer requested it in advance. *Id.* at Tr. 18:12-19; *id.*, ex. B (Officer Nicole Elder Depo.), Tr. 15:17-19. If an officer wished to request CTO fewer than thirty days in advance, she could reserve the time by signing her name on a slot in the Red Book. *Id.* Tr. 17.

Once the slots for a day were filled, further requests for CTO would be denied. Sheetz Subsection Q Decl., ex. C (Officer Eric Barangan Depo.) at Tr. 17:1-17:18 & ex. D (Officer Charles Ilacqua Depo. at 15:13-21). Oakland does not offer employees an alternate day off when it denies a CTO request. *See* Sheetz Subsection Q Decl., exs. L (Officer Peter Huppert Depo.) at Tr. 30:2-4 & M (Chad Ingebrigtsen Depo.) at Tr. 33:17-25.

Oakland does not have a policy whereby it assigns an officer to work overtime to enable another officer to take CTO. Sheetz Subsection Q Decl., ex. G (former Deputy Chief Jeffrey Loman Depo.), Tr. 238:11-16. Former deputy chief Jeffery Loman could not recall any time in his twenty-seven years with the Oakland Police Department that an officer was assigned to work overtime to accommodate another officer's CTO request. *Id.*

Oakland claims that the only reason it would deny a CTO request was to prevent the number of officers on the street from dropping to an unsafe level. *See* Spellberg Decl., ex. E (Deputy Chief Jeffrey Israel Depo.), Tr. 111:3-7 ("[W]e had such low numbers in patrol that . . . only three [CTO slots were available] and it was a hotly contested issue because that meant . . . half the number [of officers] could actually take time off using comp time."). Plaintiffs dispute this characterization of Oakland's

motivation for denying CTO requests. They cite deposition testimony that staffing levels routinely fell below the levels set in the Red Book. *See* Sheetz Decl., ex. R. (Officer James Beere Depo.), Tr. 41:9-14.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id*. The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

3

**DISCUSSION**

Defendants argue that they are entitled to summary judgment on plaintiffs' CTO claim because plaintiffs have put forward no evidence in support of their contention that Oakland's denial of requests for CTO violates the FLSA. In general, the FLSA requires employers to compensate employees at a rate of one and one-half times their regular rate for each hour they work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). Public employers, however, are permitted to pay overtime in CTO instead of in cash: for each overtime hour an employee works, he accrues the right to an hour and a half of paid leave. 29 U.S.C. § 207(o)(1). Section 207(o)(5) regulates the manner in which public employers respond to employee requests to use their accrued CTO:

> (5) An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency–
>  (A) who has accrued compensatory time off authorized to be provided under paragraph (1), and
>  (B) who has requested the use of such compensatory time,
> shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. § 207(o)(5).

At issue is whether § 207(o)(5) requires Oakland to grant an employee's request for CTO on a particular day if Oakland could do so by paying a different employee overtime. The process of assigning one employee to work for another on an overtime basis is called backfilling. The parties dispute whether *Mortensen v. County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004) held that a public employer need not backfill in order to allow an employee to take CTO on her chosen day so long as the employer grants CTO requests within a reasonable period.

*Mortensen* concerned a sheriff's deputy whose request for CTO was denied. The defendant county in *Mortensen* used a leave book with a predetermined number of available leave slots to schedule requests for CTO. 368 F.3d at 1085. Pursuant to an agreement between the deputy sheriffs' association and the county, all CTO requests had to be granted within one year. *Id.* at 1084. If a deputy requested CTO on a day when the leave slots were full, the employer would deny the request, even if another deputy was available to work overtime. *Id.* at 1085. The county asserted that the available CTO slots were determined based on the agency's need to maintain proper staffing, ensure safe and proper

4

1 scheduling of personnel, stay within departmental budgets by minimizing excess overtime
2 compensation, and avoid accrual of excess CTO time. *Id.* Mortensen submitted his CTO request for
3 a particular day about two weeks in advance. *Id.* The county denied the request because the leave book
4 was full for that day. *Id.* When he made his request, there were eighteen days with available leave slots
5 over the next two months. *Id.* Mortensen sought injunctive relief, alleging that the county had violated
6 § 207(o)(5) of the FLSA by denying his request to use CTO on a specific day without showing that
7 granting the request would unduly disrupt its operations. *Id.*

8 Affirming the district court's grant of summary judgment in favor of the county, *Mortensen* held
9 that § 207(o)(5) "unambiguously states that once an employee requests the use of CTO, the employer
10 has a reasonable period of time to allow the employee to use accrued time." *Id.* at 1090. Because the
11 statute is unambiguous, the court did not defer to Department of Labor regulations and opinion letters
12 interpreting the provision. *Id. Mortensen* rejected the plaintiff's argument that absent a showing of
13 undue burden, § 207(o)(5) required the county to backfill in order to allow him to take CTO on the day
14 he requested it:

> If Mortensen could force the county to pay another deputy overtime so that he could use his CTO, then the purpose for § 207(o) would be eviscerated. This requirement would burden the county considerably by increasing the overtime that it must pay to employees. If implemented, Mortensen's proposed construction would remove the flexibility and control from the county that is clearly contemplated by the FLSA.

18 *Id.* Finding that the county's policy of granting requests within one year was "reasonable," *Mortensen*
19 held that the county did not violate the FLSA unless it failed to follow its leave book policy or refused
20 to grant a CTO request within one year of a request. *Id.* at 1091. In light of the plaintiff's failure to
21 demonstrate the existence of a factual dispute regarding whether the county had failed to grant a CTO
22 request within a reasonable period, the Ninth Circuit did not reach the issue of "whether any specific
23 leave request caused an undue disruption." *Id.* In sum, *Mortensen* articulated the following inquiry for
24 evaluating the lawfulness of a public employer's policy for granting requests for accrued CTO leave:
25 (1) Has the plaintiff shown that public employer failed to grant CTO leave within a reasonable period
26 after the request was made? (2) If the plaintiff has shown that the employer failed to grant requests
27 within a reasonable time, has the employer shown that granting the request would impose an undue
28 burden on its operations? (3) If the plaintiff has not shown that the employer failed to grant requests

5

within a reasonable time, has the plaintiff shown that the employer failed to follow its own policy?

Plaintiffs offer no meaningful way of distinguishing *Mortensen*. Like Oakland, the defendant county in *Mortensen* used a CTO request system that requires employees to sign up in advance for a limited number of slots for CTO leave. In *Mortensen*, just as in this case, if all the slots on a particular day are full, the employer does not backfill in order to grant a CTO request. Plaintiffs argue that *Mortensen* concerned a single employee rather than a policy that affects a large group of employees. This argument fails because *Mortensen* considered the county's policy for granting CTO requests; nothing in that opinion limited its holding to disputes regarding individuals. Plaintiffs also argue that *Mortensen* was limited to the "reasonable period" requirement of § 207(o)(5). Plaintiffs are correct that Mortensen's argument failed because he was unable to show that the defendant county did not grant CTO requests within a reasonable period, but – as discussed below – this is precisely the evidentiary gap in this case. Finally, plaintiffs' characterize as *dictum* the statement in *Mortensen* that the purpose of § 207(o) would be eviscerated if an employee could force the county to backfill if the employee wished to take CTO on a particular day. This reading does not comport with the text of *Mortensen*.

Plaintiffs' real concern is that if they wished to take CTO when all the slots had been taken, Oakland would not create additional spaces in the Red Book by backfilling. This is no different from Mortensen's complaint that the county would not backfill in order to allow him to take CTO on a particular day. In fact, Oakland's policy appears to be more generous to employees because twice a year, police officers' requests for CTO on a specific date generally were honored so long as the request was made more than thirty days in advance – Oakland police officers do not have to wait a year for their CTO requests to be granted, as happened in *Mortensen*. Accordingly, the Court agrees with Oakland that *Mortensen* governs this case.

Under *Mortensen*, the Court first must ask whether plaintiffs have demonstrated the existence of a genuine factual dispute as to whether Oakland failed to grant CTO within a reasonable period. The evidentiary record here is less developed than the record in *Mortenson*. In *Mortensen*, the fact that eighteen other days were available when Mortensen made his request supported the defendant's argument that it granted CTO requests within a reasonable period. Here, there is no evidence about the number of CTO slots that remained available when a particular day's slots were filled. On the other

6

1 hand, there is also no evidence that officers were ever forced to wait an unreasonably long time to use
2 their accrued CTO. Plaintiffs claim that officers were unable to make regular use of their CTO, but *all*
3 the deposition testimony they rely on shows only that on certain occasions, officers' requests for
4 particular days were denied. Sheetz Subsection Q Decl., ex. C (Officer Eric Barangan Depo.) at Tr.
5 16:12-17:18 (officer's requests were denied "probably about five times" from 2003 until the present).[1]
6 In addition, officers testified that the "safe" way to request CTO was to make the request by letter, more
7 than thirty days in advance.

8 At trial, plaintiffs will bear the burden of proving that Oakland violated the FLSA. Oakland, as
9 the moving party, therefore need demonstrate only that there is an absence of evidence to support
10 plaintiffs' case. *See Celotex Corp.*, 477 U.S. at 323-25. The burden then shifts to plaintiffs to
11 "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R.
12 Civ. P. 56(e)). Plaintiffs have not met their burden here because they cite no evidence that any officer
13 who wished to use CTO after making his two allotted requests by letter ever looked in the Red Book
14 and found that all CTO leave for a period of time longer than a day had been taken. Thus, there is no
15 triable issue to as to whether Oakland failed to grant CTO requests within a reasonable period. Plaintiffs
16 also cite no evidence that Oakland failed to follow its Red Book policy. *Mortensen* dictates that
17 Oakland is entitled to summary judgment.

18 There is a factual dispute as to why Oakland limited the number of CTO slots for particular days.
19 Oakland claims that it denied CTO requests only to prevent the number of officers on the street from
20 dropping to an unsafe level. Plaintiffs respond by citing deposition testimony that staffing levels
21 routinely fell below those listed in the Red Book, which indicates that the Red Book staffing levels were
22 not the minimum necessary to ensure public safety.

---

[1] *See also* Sheetz Subsection Q Decl., at ex. E (Officer Andrew Trenev Depo.) at Tr. 21:8-22:12 (from January 2004 until March 2006, officer made "probably about seven or eight" requests for CTO and about "fifty percent" of his requests were approved); *id* at ex. J (Officer Todd Crutchfield Depo.) at Tr. 23:21-24:17 (during an undefined period of time, officer's requests for both CTO and vacation leave were denied "about six or ten times" out of an undefined number of requests); *id.* at ex. H (Officer Philip Gall Depo.) at Tr. 57:1-20 (officer's requests were denied "at least two times" during an undefined period); *id.* at ex. K (Officer Victor Garcia Depo.) at Tr. 48:14-21 (five of officer's requests, out of an undefined number of requests, were denied every year); *id.* at ex. L (Officer Peter Huppert Depo.) at Tr. 24:3-13 (from July 2006 to July 2008, "four or five" of officer's requests were denied).

The existence of a factual dispute on this issue does not preclude summary judgment. Under *Mortensen*, the Court does not reach the question of whether Oakland has shown it denied requests only when granting them would have disrupted the Police Department's operations. *See* 368 F.3d at 1091.

Plaintiffs urge the Court to follow *Beck v. City of Cleveland*, 390 F.3d 912 (6th Cir. 2004), in which the Sixth Circuit found that the defendant city's policy for scheduling accrued CTO, which was similar to Oakland's Red Book system, violated § 207(o)(5). The Court declines to do so for two reasons. First, *Beck* is distinguishable from this case because of a key factual difference. In *Beck*, the city denied 85% of police officer requests to take accrued CTO. 390 F.3d at 916. It is reasonable to infer from this statistic that officers were not able to take CTO on alternate days, and that their CTO requests consequently were not granted within a reasonable period. *Beck* impliedly answered the first *Mortensen* consideration – the existence of a factual dispute as to whether CTO requests were granted within a reasonable period – in the affirmative. *See id.* at 921 ("[T]he City appears to be utilizing the FLSA to avoid payment of overtime and to avoid adding personnel to meet its actual operational needs."). The Sixth Circuit therefore considered whether the city had made "a clear showing," *id.* at 914, that granting the CTO requests would result in undue disruption of its police services. *Beck* concluded that the city's stated reason for denying the requests (doing so would be a financial imposition on the police department) was not an "undue burden" within the meaning of § 207(o)(5). *Id.* In this case, plaintiffs have cited no evidence of the percentage of requests that Oakland denied, much less that CTO requests were denied the vast majority of the time.

Second, *Beck* held that the phrase "unduly disrupt" in § 207(o)(5) is "inherently ambiguous." *Id.* at 921. Noting that Congress granted rulemaking authority to the Department of Labor, *Beck* held that it was bound to defer to the Labor Secretary's interpretations of this term. *Id.* at 920 (citing *Chevron USA, Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). On this point, the Sixth Circuit disagreed with *Mortensen*, which held that § 207(o)(5) is unambiguous and that deference to Department of Labor regulations and an opinion letter by the Secretary were not warranted. *See Mortensen*, 368 F.3d at 1090. The Ninth Circuit's interpretation of § 207(o)(5) is binding on this Court.

Plaintiffs argue that notwithstanding *Mortensen*, defendants are not entitled to summary judgment because Oakland does not offer police officers an alternate day for CTO leave when it denies

8

an officer's request.  Plaintiffs rely on *Heitmann v. City of Chicago*, 2007 WL 2739559 (N.D. Ill. Sept. 11, 2007), *aff'd* 560 F.3d 642 (7th Cir. 2009).  Both the district court and the Seventh Circuit rejected the Ninth Circuit's determination that § 207(o)(5) is unambiguous.  Contrary to *Mortensen*'s conclusion that the employer need not show that a request would impose an undue burden unless there is evidence of the employer's failure to grant requests within a reasonable period, *see* 368 F.3d at 1091, the district court in *Heitmann* held that when the city denies a CTO request for a certain date without offering alternative dates, "it does so without engaging in an undue disruption analysis as required by the FLSA, and fails to comply with the statute."  2007 WL 2739559, at *18.

As *Heitmann* conflicts with binding Ninth Circuit authority, its rule that an employer must offer alternative dates when it denies a CTO request is not persuasive to this Court.  The Court also notes that in *Heitmann*, the plaintiff officers testified about dozens of specific occasions on which they believed it would have been impossible for them to take CTO when they needed it, and one officer testified that the Chief of Patrol's Office issued statements that said, "'Don't bother requesting compensatory time because it will not be granted' and/or it 'will be denied.'"  2007 WL 2739559, at *6.  In contrast, there is no evidence here that officers routinely encountered no CTO options in the Red Book for a particular time period.

Accordingly, the Court finds that there is no genuine issue of material fact as to whether Oakland failed to grant requests to take accrued CTO leave within a reasonable period, and GRANTS Oakland's motion for summary judgment on this issue.

## CONCLUSION

For the foregoing reasons and good cause shown, defendant's motion for partial summary judgment is GRANTED. [Docket No. 118]

**IT IS SO ORDERED.**

Dated: July 17, 2009

SUSAN ILLSTON
United States District Judge

9